RANSOM & GILBERTSON, LLP
Michael K. Yeabsley
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
Telephone: +1.503.226.3664

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TIANNA JENELL, derivatively on behalf of NIKE, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN J. DONAHOE II, MATTHEW FRIEND, CATHLEEN BENKO, TIMOTHY COOK, THASUNDA B. DUCKETT, MONICA GIL, ALAN B. GRAF, JR., PETER B. HENRY, TRAVIS A. KNIGHT, MARK G. PARKER, MICHELLE A. PELUSO, JOHN W. ROGERS, AND ROBERT SWAN, <br><br> Defendants, <br><br> and <br><br> NIKE, INC., <br><br> Nominal Defendant. | Case No.: 3:26-cv-1470 <br><br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Tianna Jenell ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Nike, Inc. ("Nike" or the "Company"), brings this Verified Shareholder Derivative Complaint against John J. Donahoe II ("Donahoe"), Matthew Friend ("Friend"), Cathleen Benko ("Benko"), Timothy Cook ("Cook"), Thasunda B. Duckett ("Duckett"), Monica Gil ("Gil"), Alan B. Graf, Jr. ("Graf"), Peter B. Henry ("Henry"), Travis A. Knight ("Knight"), Mark G. Parker ("Parker"), Michelle A. Peluso ("Peluso"), John W. Rogers, Jr. ("Rogers"), and Robert Swan ("Swan") (collectively, the "Individual Defendants" and, together with Nike, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Nike with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *In re Nike, Inc. Securities Litigation*, Case No. 3:24-cv-00974-AN (D. Or.) (the "Securities Class Action") and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

153.    This is a shareholder derivative action brought against certain current and former Nike officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between March 18, 2021 and October 1, 2024, inclusive (the "Relevant Period").

154.    Nike is the world's largest designer, marketer, and seller of athletic footwear, apparel, and equipment. The Company conducts business through its NIKE, Jordan, Converse, and affiliated brands, distributing products through Nike Digital, Company-owned retail stores, wholesale partners, distributors, and licensees worldwide.

155.    Beginning in 2017, Nike fundamentally transformed its business through its "Consumer Direct Offense" initiative, which sought to shift the Company's business away from traditional wholesale partners and toward direct-to-consumer sales through Nike-owned retail stores and digital platforms. In 2020, under newly appointed Chief Executive Officer ("CEO"), Defendant Donahoe, Nike expanded that initiative through its Consumer Direct Acceleration ("CDA") strategy, which Defendants described as a digitally empowered transformation that would strengthen consumer relationships, accelerate innovation, improve inventory management, increase profitability, and deliver sustainable long-term revenue growth.

156.    The CDA strategy became the centerpiece of Nike's long-term corporate strategy. Defendants repeatedly represented that Nike possessed unique competitive advantages that positioned it to execute the strategy successfully, including sophisticated digital capabilities, an advanced direct-to-consumer supply chain, superior technology infrastructure, innovative product development, deep consumer engagement, and a powerful global brand capable of sustaining the Company's competitive leadership despite reducing its reliance on longstanding wholesale partners.

157.    Throughout the Relevant Period, however, Defendants concealed that the operational foundations necessary for the CDA strategy to succeed were deteriorating. While pursuing the CDA strategy, the Company struggled to build an effective direct-to-consumer supply chain, integrate updated technology systems, maintain a sufficient pipeline of innovative products,

preserve the strength of its marketplace strategy, and accurately respond to changing consumer demand. These internal deficiencies substantially undermined the Company's ability to execute the CDA strategy, which Defendants repeatedly touted to investors.

158.   Despite knowing of these deficiencies, Defendants continually reassured investors that the CDA strategy was working as intended. Defendants repeatedly issued materially false and misleading statements through SEC filings, proxy statements, earnings releases, earnings calls, investor conferences, and other public communications, consistently representing that Nike's digital transformation was succeeding, that its innovation pipeline remained strong, that consumer demand was healthy, that its marketplace strategy was strengthening the Company's competitive position, and that the Company's investments in technology, analytics, and direct consumer engagement were producing sustainable long-term growth. Defendants further solicited shareholder votes through annual proxy statements that incorporated these same allegedly false and misleading representations regarding Nike's business, operations, and prospects.

159.   As detailed herein, these public statements concealed that the CDA strategy had failed to achieve its promised objectives and that Nike's internal operational problems had materially impaired the Company's ability to generate sustainable growth. Rather than disclose these issues, Defendants allegedly continued portraying the Company's transformation as successful while assuring investors that Nike's competitive advantages insulated it from increasing competitive pressures and positioned it for continued long-term success.

160.   The truth was revealed on June 27, 2024, when Nike reported disappointing fourth-quarter and full-year fiscal 2024 financial results, withdrew key growth expectations, acknowledged significant operational shortcomings, and announced strategic changes designed to reverse prior initiatives. On this news, Nike's Class B common stock declined approximately 20%, falling

from a closing price of $94.19 per share on June 27, 2024, to close at $75.37 per share on June 28, 2024.

161.    As a result of the foregoing, the Securities Class Action was filed against the Company as well as Defendants Donahoe and Friend on June 20, 2024, in the United States District Court for the District of Oregon.

162.    On June 1, 2026, Plaintiff, through Plaintiff's counsel, served a demand on Nike's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Nike to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A. On June 18, 2026, Plaintiff's counsel received a letter on behalf of the Board (the "Refusal Letter") indicating that the Board intended "to defer substantive consideration" of the Demand and that it would revisit the Demand "when appropriate, including potentially following final resolution of the Securities Class Action." The Refusal Letter is attached hereto as Exhibit B.

## **VENUE**

163.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 21D of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a)(1), and 78u-4(f), Rule 14a-9 of the Exchange Act (17 C.F.R § 240.14a-9), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

164.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

165. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

166. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

167. Plaintiff is a current shareholder of Nike and has continuously held Nike common stock at all relevant times.

168. Nominal Defendant Nike is incorporated under the laws of Oregon and its principal executive offices are located at One Bowerman Drive, Beaverton, Oregon 97005. Nike's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "NKE."

169. Defendant Donahoe served as the Company's President and Chief Executive Officer ("CEO") from January 2020 until October 14, 2024. Defendant Donahoe also served as a member of the Executive Committee. According to the Company's public filings, during the Relevant Period, Defendant Donahoe received total compensation of $32,920,708 for the 2021 Fiscal Year, $28,838,060 for the 2022 Fiscal Year, $32,789,885 for the 2023 Fiscal Year, and $24,184,701 for the 2024 Fiscal Year.

170. Defendant Friend has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since April 2020. According to the Company's public filings, during the Relevant Period, Defendant Friend received total compensation of $11,951,087 for the 2021 Fiscal Year, $7,739,210 for the 2022 Fiscal Year, $10,157,239 for the 2023 Fiscal Year, and $10,390,510 for the 2024 Fiscal Year.

171.    Defendant Benko has served as a Company director since 2018. Defendant Benko also serves as a member of the Compensation Committee. According to the Company's public filings, during the Relevant Period, Defendant Benko received total compensation of $308,659 for the 2021 Fiscal Year, $301,522 for the 2022 Fiscal Year, $321,890 for the 2023 Fiscal Year, and $309,484 for the 2024 Fiscal Year.

172.    Defendant Cook has served as a Company director since 2005. Defendant Cook also serves as the Chair of the Compensation Committee. According to the Company's public filings, during the Relevant Period, Defendant Cook received total compensation of $358,969 for the 2021 Fiscal Year, $349,453 for the 2022 Fiscal Year, $365,190 for the 2023 Fiscal Year, and $375,770 for the 2024 Fiscal Year.

173.    Defendant Duckett has served as a Company director since 2019. Defendant Duckett also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. According to the Company's public filings, during the Relevant Period, Defendant Duckett received total compensation of $308,969 for the 2021 Fiscal Year, $299,453 for the 2022 Fiscal Year, $320,190 for the 2023 Fiscal Year, and $290,770 for the 2024 Fiscal Year.

174.    Defendant Gil has served as a Company director since 2022. Defendant Gil also serves as a member of the Compensation Committee. According to the Company's public filings, during the Relevant Period, Defendant Gil received total compensation of  $259,872 for the 2023 Fiscal Year, and $290,770 for the 2024 Fiscal Year.

175.    Defendant Graf served as a Company director from 2002 until June 2024. Defendant Graf also served as a member of the Audit and Finance Committee. According to the Company's public filings, during the Relevant Period, Defendant Graf received total compensation of $318,969 for the 2021 Fiscal Year, $309,453 for the 2022 Fiscal Year, $335,190 for the 2023 Fiscal

Year, and $325,770 for the 2024 Fiscal Year.

176.    Defendant Henry has served as a Company director since 2018. Defendant Henry also serves as a member of the Audit and Finance Committee. According to the Company's public filings, during the Relevant Period, Defendant Henry received total compensation of $301,469 for the 2021 Fiscal Year, $296,953 for the 2022 Fiscal Year, $317,690 for the 2023 Fiscal Year, and $305,770 for the 2024 Fiscal Year.

177.    Defendant Knight has served as a Company director since 2015. Defendant Knight also serves as a member of the Executive Committee. According to the Company's public filings, during the Relevant Period, Defendant Knight received total compensation of $288,969 for the 2021 Fiscal Year, $279,453 for the 2022 Fiscal Year, $300,190 for the 2023 Fiscal Year, and $290,770 for the 2024 Fiscal Year.

178.    Defendant Parker has served as a Company director since 2006 and served as the Company's President and CEO from 2006 until 2020. Defendant Parker is the Executive Chairman of the Board and also serves as the Chair of the Executive Committee. According to the Company's public filings, during the Relevant Period, Defendant Parker received total compensation of $24,477,982 for the 2021 Fiscal Year, $11,834,368 for the 2022 Fiscal Year, $9,938,812 for the 2023 Fiscal Year, and $8,064,597 for the 2024 Fiscal Year.

179.    Defendant Peluso has served as a Company director since 2014. Defendant Peluso also serves as the Chair of the Sustainability & Governance Committee and as a member of the Corporate Responsibility Committee. According to the Company's public filings, during the Relevant Period, Defendant Peluso received total compensation of $328,969 for the 2021 Fiscal Year, $319,453 for the 2022 Fiscal Year, $422,330 for the 2023 Fiscal Year, and $335,770 for the 2024 Fiscal Year.

180.	Defendant Rogers has served as a Company director since 2018. Defendant Rogers also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. According to the Company's public filings, during the Relevant Period, Defendant Rogers received total compensation of $288,969 for the 2021 Fiscal Year, $299,453 for the 2022 Fiscal Year, $300,190 for the 2023 Fiscal Year, and $290,770 for the 2024 Fiscal Year.

181.	Defendant Swan has served as a Company director since 2022. Defendant Swan also serves as a member of both the Corporate Responsibility and Sustainability & Governance Committees. According to the Company's public filings, during the Relevant Period, Defendant Swan received total compensation of $282,127 for the 2023 Fiscal Year, and $315,770 for the 2024 Fiscal Year.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

182.	By reason of their positions as officers, directors, and/or fiduciaries of Nike and because of their ability to control the business and corporate affairs of Nike, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

183.	Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects

9

so that the market price of the Company's stock would be based on truthful and accurate information.

184.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

185.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all

times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

186.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF CONDUCT

187.     Nike maintains a Code of Conduct, which states that its purpose is to "provide[] an overview of the laws, regulations and company policies that apply to us and the work we do, but it does more than that." Additionally, the Code of Conduct requires that "our employees and Board members to comply with both the letter and spirit of the Code and make decisions that will

preserve the trust that other have placed in us."

188.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following,

in relevant part:

> Nike respects the rights of its employees to partake in activities – financial, business or otherwise – outside of work, as long as that activity does not interfere with Nikes interests or the parameters of your employment.
>
> But conflicts with Nike must be avoided. If you use your position at Nike for personal gain, that's a conflict. And if your personal activity could compromise – or even appear to compromise – your ability to make the best business decisions for Nike, that's a conflict.
>
> Learning to recognize potential conflicts of interest can help you avoid one. A conflict can happen when you supervise or conduct business with someone with whom you have a close personal relationship. And it can also happen when you own, invest in or do work for a company that competes, does business or wants to do business with Nike. A conflict can even happen if you simply accept, give or offer gifts, hospitality or favors from or to parties doing business with Nike.
>
> Potential conflicts can often be resolved with an open and honest discussion. Remember: having a conflict of interest is not necessarily a violation of our Code, but failing to disclose it is.

189.     In a section titled, "Insider Trading," the Code of Conduct states the following:

> Don't use or share nonpublic information to buy or sell stock
>
> We share necessary and appropriate information about Nike's business with our teammates to help us get our work done. Some of this information isn't available to the public and may be what United States securities laws deem to be material: sensitive and important enough that it could influence an investment decision. To use material nonpublic information to buy or sell stock – or to pass it along to someone else so they may do so – could constitute insider trading. Insider trading not only violates our Code, it violates the law. Don't do it.
>
> You can help to prevent insider trading by keeping Nike information tight. Don't share material nonpublic information with anyone, including family and friends. In addition, if you need to share confidential information with a third party as part of your job, make sure the party receiving the information has signed a non-disclosure agreement or is otherwise required to keep the information confidential.

Two good rules of thumb: Share sensitive Nike information with colleagues only when absolutely needed to accomplish your business objectives. And never discuss sensitive or nonpublic information in open spaces.

190.    In a section titled, "Books and Records," the Code of Conduct states the following:

Make sure Nike's records are clear, accurate and complete

Financial integrity and fiscal responsibility are about more than accurate reporting of our financials, though that's certainly part of it. When we spend money on Nike's behalf, we're ultimately spending it for our shareholders. Our records, and how we maintain them, are a sign of our company's financial health.

Each of us has a responsibility to spend money appropriately, and to keep our records clear, accurate and complete. This matters in every transaction, whether you are hiring a new vendor, expensing something to Nike, signing a new business contract, preparing a financial statement or simply completing a time sheet. Our records retention policy ensures we retain the right records, in the right way, for the right periods of time.

Needless to say, you should never falsify any record or account. Be candid and transparent with management, shareholders or anyone responsible for financial reporting, forecasts or business information. To help ensure accuracy, Nike maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements in every location in which we operate.

Should you be involved in an external or internal audit, cooperate fully and provide complete, accurate and timely responses to questions and document requests. If asked by the Ethics & Compliance Office, Global Investigations or Global Litigation to retain records, do so until you are told retention is no longer necessary.

### THE AUDIT & FINANCE COMMITTEE CHARTER

191.    Nike also maintains an Audit & Finance Committee Charter (the "Charter"), which states that the purpose of the Audit & Finance Committee "is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, and internal controls of the Company."

192.    The Charter enumerates the duties and responsibilities of the Audit & Finance Committee as follows:

13

193.     The sole authority to retain, with shareholder ratification, and terminate the Company's independent auditor, to approve all audit engagement fees, compensation and terms, and to directly oversee the work of the independent auditor with respect to the annual audit of the Company.

194.     To instruct the Company's independent auditor that it is to report directly to the Committee.

195.     The sole authority to approve in advance all audit and legally permitted non-audit services to be provided by the Company's independent auditor, and audit services provided by others; provided, however, that advance approval of non-audit services by the independent auditor shall not be required if:

1. The aggregate amount of fees for all such non-audit services provided to the Company constitutes not more than five percent of the total amount of revenues paid by the Company to its auditor during the fiscal year in which the non-audit services are provided;

2.     the services were not recognized by the Company at the time of the engagement to be non-audit services; and

3.     the services are promptly brought to the attention of the Committee and approved prior to the completion of the audit the Committee or by one or more members of the Committee who are members of the Board to whom authority to grant such approvals has been delegated by the Committee.

(a)     The sole authority to delegate to one or more designated members of the Committee who are independent directors of the Board, the authority to grant advance approvals of audit and non-audit services as described in Section 3 above.

(b)     At least annually, to obtain and review a report by the independent auditor describing: the firm's internal quality control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm and any steps taken to deal with any such issues; and all relationships between the independent auditor and the Company.

(c)      At least annually, to evaluate the independent auditor's qualifications, performance, and independence, which evaluation shall include review and evaluation of the lead partner of the independent auditor and a review of the report referred to in Section 5 above. In making its evaluation, the Committee shall take into account the opinions of management and the Company's internal auditors. The Committee shall further ensure the rotation of the lead audit and review partners every five years, or more frequently as the Committee shall determine in its sole discretion. The Committee shall decide as to whether the Company is obtaining high quality audits and whether rotation of the auditor would be helpful. The Committee shall present its conclusions with respect to the independent auditor to the Board.

4.      To discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.      To review NIKE's Annual Report to be filed with the SEC on Form 10-K,and recommend to the Board that the audited financial statements be included in the Form 10-K.

6.      To discuss with the independent auditor any items required to be communicated by the independent auditor in accordance with SAS 61and 100.

7.      To discuss with the Chief Executive Officer and the Chief Financial Officer the individual certifications required to be filed with the Company's periodic reports to the SEC.

8.      To discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

9.      To engage and compensate independent counsel and other advisors, as the Committee determines necessary to carry out its duties.

10.      To discuss policies with respect to risk assessment and risk management and to discuss the Company's major financial and other risk exposures, including risks related to information security and data protection, and the steps management has taken to monitor and control such exposures.

11.      To meet periodically with the chief information officer or chief information security officer to review risks related to information security and data protection.

12.      To meet separately, at least quarterly, with management, with internal auditors, and with the independent auditor.

13.     To review with the independent auditor any audit problems or difficulties and management's response, including, but not limited to, any restriction on the scope of the independent auditor's activities or on access to requested information, any significant disagreements with management, any accounting adjustments that were noted or proposed by the auditor but were passed as immaterial or otherwise, any communications between the audit team and audit firm's national office respecting auditing or accounting issues presented by the engagement, and any "management" or "internal control "letter issued, or proposed to be issued, by the independent auditor to the Company. The review shall also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

14.     To resolve disagreements between management and the independent auditor regarding financial reporting.

15.     To obtain from the Company's independent auditor any information required to be provided pursuant to Rule 2-07 of Regulation S-X.

16.     To review and approve, if appropriate, the internal audit charter and any changes thereto.

17.     To ensure that the chief internal auditor is independent of the Company's management and to concur in the selection, retention, and dismissal of the chief internal auditor.

18.     To review management's assessment of the effectiveness of the Company's accounting and internal control structure and procedures.

19.     To establish procedures for (i) receipt, retention, treatment, processing and resolution of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

20.     To set hiring policies for employees or former employees of the independent auditor all in accordance with applicable legal requirements.

21.     To meet periodically with the general counsel or other legal counsel to review legal and regulatory matters, including any matters that may have material effect on the financial statements of the Company.

22.     To meet periodically with the Company's internal Clearance Director, who reviews and approves in advance all trades of NIKE common stock owned by the Company's directors and officers who are subject to Section 16 of the '34 Act.

23.     To receive reports from the Company's internal Disclosure Committee, which is responsible for quarterly review of material issues regarding accounting,

financial reporting, public disclosure, internal control, and fraud issues in respect of the financial statements of the Company.

24.    To report regularly to the Board any material issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

25.    To direct the preparation of and approve the Audit & Finance Committee Report for inclusion in the annual Proxy Statement that summarizes the Committee's activities in compliance with Item 7of Schedule 14A under the Securities Exchange Act of 1934.

26.    To direct the preparation and execution of the NYSE's annual written affirmation of director independence and qualifications to serve on the Committee as required by the NYSE Listed Company Manual.

27.    To annually evaluate the performance of the Committee and report the results of the Committee performance evaluation to the Board.

28.    To review and assess annually the adequacy of the Committee's charter.

29.    To perform such additional activities and consider such other matters within the scope of its responsibilities as the Committee or the Board deems necessary or appropriate.

## SUBSTANTIVE ALLEGATIONS

**Background**

44.    Historically, Nike generated the overwhelming majority of its revenue through two complementary sales channels: Nike Direct and Wholesale. Nike Direct consisted of the Company's owned retail stores, Nike.com, the NIKE App, SNKRS, and other digital platforms through which Nike sold products directly to consumers. Wholesale sales consisted of sales to third-party retailers who then sold Nike products directly to consumers. While Nike had long operated both channels successfully, beginning in 2017, management embarked upon a strategic initiative to fundamentally reshape the Company's business by increasing the proportion of sales generated through Nike Direct, particularly its digital platforms.

45.     In June 2017, Nike announced its "Consumer Direct Offense" ("CDO") strategy, which sought to accelerate innovation, deepen direct consumer relationships, increase digital engagement, and expand Nike's direct-to-consumer ("DTC") business. According to the Company, the CDO strategy would "double innovation," "double speed," and "double direct connections with consumers," while creating a unified Nike Direct organization responsible for integrating the Company's digital commerce platforms and retail operations. Over the following several years, Nike increasingly shifted its sales mix toward Nike Direct, with digital commerce becoming an increasingly significant contributor to Company revenue.

46.     Nike's digital transformation accelerated significantly after Defendant Donahoe became President and CEO in January 2020. Defendant Parker publicly stated that Donahoe's expertise would "accelerate our digital transformation and ... build on the positive impact of our Consumer Direct Offense," while management and industry analysts repeatedly highlighted Donahoe's technology background as central to Nike's future growth strategy.

47.     On June 25, 2020, Defendants announced the next phase of Nike's transformation, the Consumer Direct Acceleration ("CDA") strategy, which Defendant Donahoe described as "a new digitally empowered phase of our Consumer Direct strategy." Under the CDA strategy, Nike committed to accelerating investments in digital commerce, reducing its dependence on traditional wholesale partners, reorganizing significant portions of the Company around new consumer-focused operating structures, integrating technology across the enterprise, and creating a supposedly more connected digital marketplace capable of delivering sustainable long-term revenue growth and improved profitability.

48.     Throughout the Relevant Period, Defendants repeatedly represented that the CDA strategy was driving long-term growth, strengthening Nike's competitive advantages, and

transforming the Company's financial model. The success of the CDA strategy, however, depended upon the successful execution of several mission-critical operational initiatives. As Defendants themselves repeatedly acknowledged in public filings, earnings calls, investor presentations, and other public statements, the strategy required Nike to: (i) develop a sophisticated direct-to-consumer supply chain; (ii) build and integrate an enterprise-wide technology infrastructure capable of supporting Nike's expanding digital ecosystem; (iii) reorganize the Company around new consumer constructs; (iv) maintain a robust pipeline of innovative products while effectively managing legacy product franchises; (v) preserve Nike's competitive separation and brand strength as competitors expanded their market positions; and (vi) successfully shift consumer purchasing behavior away from traditional wholesale channels toward Nike's own stores and digital platforms. According to Defendants, each of these initiatives was fundamental to the CDA strategy's ability to produce the long-term, sustainable growth repeatedly promised to shareholders.

49.    Contrary to the Individual Defendants' repeated public representations, however, each of these operational pillars experienced significant internal difficulties throughout the Relevant Period. As detailed below, confidential witnesses, former employees, contemporaneous internal information, and Defendants' own later admissions demonstrate that Nike struggled to develop the direct-to-consumer supply chain, technology infrastructure, organizational structure, innovation pipeline, marketplace strategy, and consumer engagement necessary for the CDA strategy to succeed. Rather than disclose these known operational deficiencies, Defendants continued to publicly represent that the CDA strategy was successfully transforming Nike's business, strengthening its competitive position, and driving sustainable long-term growth, while causing the Company to issue materially misleading proxy statements, SEC filings, earnings releases, and other public disclosures concerning the Company's operations, strategy, and prospects.

19

**Materially False and Misleading Statements Issued During the Relevant Period**

*March 18, 2021 Press Release and Earnings Call*

50.     On March 18, 2021, Nike issued a press release announcing its financial results for the third quarter of the 2021 fiscal year (the "3Q 2021 Press Release"). The 3Q 2021 Press Release emphasized that quarterly revenues increased 3% from the prior year, led by 51% reported revenue growth in Greater China, and that NIKE Brand digital sales increased 59%, with strong double-digit increases across all geographies. In the release, Defendant Donahoe attributed Nike's performance to the Company's "strong competitive advantages," stating: "NIKE continues to deeply connect with consumers all over the world driven by our strong competitive advantages . . . . Our strategy is working, as we accelerate innovation and create the seamless, premium marketplace of the future." Defendant Friend likewise stated that "NIKE's brand momentum is as strong as ever, and we are driving focused growth against our largest opportunities."

51.     That same day, Nike held an earnings conference call with investors and analysts to discuss the Company's financial results. During the call, Defendant Donahoe highlighted Nike's "tremendous success in digital," describing the Company's "digital transformation" as a "unique advantage" powering the Nike brand. In response to a question regarding the CDA strategy, Defendant Donahoe further stated that Nike had "fairly impressively pivot[ed] to a more direct-to-consumer supply chain," explaining that the Company could identify inventory in local and regional warehouses and deliver product more rapidly to consumers. Defendant Donahoe also represented that Nike's brand was "propelled by our unmatched innovation investment and pipeline," and that Nike "consistently bring[s] fresh, new product to market supported by compelling storytelling that helps drive consumer demand."

*April 26, 2021 UC Berkeley Haas School of Business Appearance*

52.    On April 26, 2021, Defendant Friend appeared in a video posted by the University of California, Berkeley Haas School of Business as part of the Haas "Dean's Speaker Series." In the video, Defendant Friend touted the operational pillars that the CDA strategy depended on. He stated that "product innovation and product and storytelling is what makes NIKE special," and that Nike was "investing maniacally behind product innovation, sustainability, and then ultimately creating these digital . . . platform[s] that enable[] us to have those one-to-one connections with consumers at scale."

53.    Defendant Friend further represented that Nike was successfully using "[p]ersonalization, leveraging data analytics, [and] machine learning" to understand consumer behavior, and that Nike was "employing data and analytics capabilities in our supply chain" so that the Company could "more smartly flow our product" and determine "where to put our product." According to Defendant Friend, the result was "higher margins because we have less waste, less mark-downs, less inefficiency, and where product sits around the world."

### June 24, 2021 Press Release and Earnings Call

54.    On June 24, 2021, Nike issued a press release announcing its financial results for the fourth quarter and full fiscal year 2021 (the "4Q 2021 Press Release"). Defendant Donahoe stated in the 4Q 2021 Press Release that "NIKE's strong results this quarter and full fiscal year demonstrate NIKE's unique competitive advantage and deep connection with consumers all over the world," and further asserted that "FY21 was a pivotal year for NIKE as we brought our Consumer Direct Acceleration strategy to life across the marketplace." Defendant Donahoe added that, "[f]ueled by our momentum, we continue to invest in innovation and our digital leadership to set the foundation for NIKE's long-term growth." Defendant Friend similarly emphasized Nike's "authentic consumer connections, digital strength and continued operational execution," and stated

that, "[a]s we advance our consumer-led digital transformation, we are building a new financial model that will continue to fuel long-term sustainable, profitable growth for NIKE."

55.    On the same day, Nike held an earnings call with investors and analysts. Defendant Donahoe again touted Nike's competitive position, stating that the Company's "strong business results proved yet again NIKE's unique competitive advantage." He further represented that Nike was "better positioned to drive sustainable long-term growth than we were before the pandemic," and that Nike's "relentless pipeline of innovative product continues to create separation between us and our competition." Donahoe added that Nike's product was "fueled by sharp consumer insight, supported by marketing data and analytics," and that, through Nike's new operating model, the Company was "bringing more precision to the art of product creation."

56.    Defendant Friend also explained Nike's CDA strategy on the call, stating that Nike would make an "accelerated shift to a more direct member-centric business model," where "[g]rowth will be led by NIKE Direct and our strategic marketplace partners." Defendant Friend further stated that Nike Direct was expected "to represent approximately 60% of the business in fiscal '25, led by growth in digital."

### July 20, 2021 Form 10-K

57.    On July 20, 2021, Nike filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2021 (the "2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants Donahoe, Friend, Parker, Benko, Cook, Duckett, Graf, Henry, Knight, Peluso, and Rogers. The 2021 Form 10-K warned that a potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand "could have a material adverse effect on our sales and profitability."

58. The 2021 Form 10-K also warned that, "[i]f we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products." In addition, the filing warned that a potential "[f]ailure to maintain our reputation, brand image and culture could negatively impact our business."

59. The 2021 Form 10-K further discussed Nike's digital technology investments, stating that the Company had "made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations," and that Nike's digital offerings would require "continued investment in the development and upgrading of our technology platforms." The filing further warned that Nike "may not be successful in developing platforms that operate effectively" with other technologies, systems, networks, or standards.

60. These risk disclosures were materially false and misleading because they presented as hypothetical future risks problems that had already begun to materialize. Defendants knew or recklessly disregarded that Nike had not maintained the innovation pipeline necessary to support the CDA strategy, that the Company's competitive position and brand strength were already under pressure, and that Nike was already experiencing significant difficulties developing and integrating the technology infrastructure necessary to support a digitally led direct-to-consumer business at scale. By framing these risks as contingent future possibilities, Defendants concealed from shareholders that the CDA strategy's foundational assumptions were already impaired.

*September 23, 2021 Earnings Call*

61. On September 23, 2021, Nike held an earnings call to discuss its first quarter 2022 results. During that call, Defendant Donahoe represented that Nike was "in a stronger position relative to our competition than we were prior to the pandemic," explaining that consumers'

accelerated shift to digital "plays to NIKE's advantage" and that the Company's "Consumer Direct Acceleration strategy is capitalizing on this marketplace transformation."

62.     During the same call, Defendant Friend stated that Nike had been accelerating investments to drive its digital transformation and, in particular, investing in "technology" and "creating a digital-first supply chain in the marketplace." That same day, the Company issued a press release that quoted Defendant Friend as stating that "NIKE is a growth company with a market opportunity as large as it's ever been," and that the Company's "Q1 results illustrate how NIKE's Consumer Direct Acceleration strategy continues to fuel growth and transform our long-term financial model."

### October 5, 2021 Form 10-Q

63.     On October 5, 2021, Nike filed its Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2021 (the "1Q 2022 10-Q"). The 1Q 2022 10-Q was signed by Defendants Donahoe and Friend and stated:

> "Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with NIKE Digital and our owned stores, as well as select strategic partners who share our marketplace vision. We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation."

### October 6, 2021 Annual General Meeting

64.     On October 6, 2021, Nike held its Annual General Meeting. At the meeting, Defendant Donahoe told shareholders that Nike was "the clear leader[] in digital in our industry," that owned Digital revenue was "over 20% of our business," and that, by fiscal 2025, Nike expected its business to be "40% owned Digital." Defendant Donahoe further represented that this shift was

24

having "a profound transformation on our operating model," and that Nike was "creating greater value for both consumers and shareholders." He concluded: "We are clearly seeing our strategy work."

65.    In response to a shareholder question regarding how the CDA strategy was progressing, Defendant Donahoe stated: "NIKE's strategy is working, and we're very encouraged and excited by the progress we've seen thus far." Defendant Donahoe further stated that the CDA strategy was "transforming NIKE with direct impacts that we can already see on our ability to serve consumers end-to-end with a premium and seamless experience, and on our business."

66.    At the same meeting, Defendant Friend stated that "the Consumer Direct Acceleration is having a profound effect also on our operating model," that Nike's shift to a more direct model had resulted in "Nike's highest EBIT margin in recent history," and that the "investments we've made against our end-to-end digital transformation are making us more agile." Friend further represented that Nike was "building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-to-consumer business at scale."

67.    Defendant Parker also represented that "[t]he pace of innovation has not slowed down at all." Defendant Donahoe further stated that Nike had "successfully realigned our organization" as part of CDA and was investing in "our highest-growth areas."

***November 18, 2021 Press Release***

68.    On November 18, 2021, Nike issued a press release announcing an 11% increase in the Company's quarterly dividend. In the release, Defendant Donahoe stated that: "NIKE continues to fuel growth through our Consumer Direct Acceleration strategy, while generating strong cash flow and increasing returns to shareholders." Defendant Donahoe further stated that the

dividend increase reflected Nike's "strong track record and confidence in our ability to deliver sustainable, profitable, capital-efficient growth over the long-term."

### December 20, 2021 Press Release and Earnings Call

69.    On December 20, 2021, Nike issued a press release announcing its financial results for the second quarter of fiscal 2022 (the "Q2 2022 Press Release"). The Q2 2022 Press Release quoted Defendant Donahoe as stating that "NIKE's strong results this quarter provide further proof that our strategy is working," and represented that the Company was "now in a much stronger competitive position today than we were 18 months ago." Defendant Donahoe also credited Nike's global workforce for providing consumers "with the compelling new product, innovation and experiences that only NIKE can deliver."

70.    That same day, Nike held an earnings call with investors and analysts. During the call, Defendant Donahoe again stated that "[t]he results we delivered offer continued proof that our strategy is working," and later reiterated that Nike was "stronger than we were before the pandemic" and that the Company's results were "evidence that our strategy is working."

71.    Defendant Friend also touted the CDA strategy during the call, stating: "Consumer Direct Acceleration is driving our business forward, and it is transforming our financial model." Defendant Friend further represented that Nike was "building NIKE for the future with deeper consumer connections, a pipeline of product innovation to serve the needs of the modern athlete, and new operational capabilities required to serve consumers directly and digitally at scale."

### January 6, 2022 Form 10-Q

72.    On January 6, 2022, Nike filed its Quarterly Report on Form 10-Q for the quarter ended November 30, 2021 (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendants

Donahoe and Friend and described the CDA strategy as the centerpiece of its business transformation, stating:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with NIKE Digital and our owned stores, as well as select strategic partners who share our marketplace vision. We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation.

### March 21, 2022 Earnings Release and Earnings Call

73.    On March 21, 2022, Nike issued a press release announcing its financial results for the third quarter of the 2022 fiscal year (the "Q3 2022 Press Release"). The Q3 2022 Press Release quoted Defendant Donahoe as stating:

> NIKE's strong results this quarter show that our Consumer Direct Acceleration strategy is working. Fueled by deep consumer connections, compelling product innovation and an expanding digital advantage, we have the right playbook to navigate volatility and create value through our relentless drive to serve the future of sport.

74.    During the accompanying earnings call held the same day, the Individual Defendants continued to attribute Nike's performance to the supposed success of CDA and the operating pillars on which it depended. Defendant Donahoe emphasized Nike's "growing digital advantage," represented that Nike was creating "greater competitive separation," and continued to describe Nike Digital as a competitive strength supporting the Company's long-term growth strategy.

75.    On the same call, Defendant Friend likewise represented that the Company had established "the foundation" for continued growth and again tied Nike's expected performance to CDA. Friend stated that Nike remained positioned to deliver strong growth because "our

27

Consumer Direct Acceleration strategy is working," and further emphasized Nike's ability to manage through volatility while continuing to build a more direct, digital, and profitable business model.

### March 30, 2022 Adobe Promotional Appearance

76.    On March 30, 2022, Defendant Donahoe appeared in a promotional video released by Adobe. In that video, Defendant Donahoe highlighted Nike's use of Adobe technology as part of the Company's digital transformation and represented that Adobe's platform had "played such an important role" in helping Nike deliver "a more personalized experience for our consumers."

### April 5, 2022 Form 10-Q

77.    On April 5, 2022, Nike filed its Quarterly Report on Form 10-Q for the quarter ended February 28, 2022 (the "Q3 2022 10-Q"). Like the Q2 2022 10-Q, the Q3 2022 10-Q again described CDA as creating "the marketplace of the future" through premium and seamless consumer experiences, led by Nike Digital, Nike-owned stores, and selected strategic partners.

78.    The Q3 2022 10-Q also repeated that Nike had aligned its product creation and category organizations around the consumer construct and continued investing in "data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation" to accelerate Nike's digital transformation.

### June 27, 2022 Earnings Release and Earnings Call

79.    On June 27, 2022, Nike issued a press release announcing its financial results for the fourth quarter and full fiscal year 2022 ("Q4 2022 Press Release"). The Q4 2022 Press Release quoted Defendant Donahoe as stating that "Our competitive advantages, including our pipeline of innovative product and expanding digital leadership, prove that our strategy is working."

80.    During the accompanying earnings call, Defendant Donahoe again emphasized Nike's innovation pipeline and competitive position. He represented that Nike's "relentless pipeline of innovative products continues to drive separation between us and our competition," and continued to describe Nike Digital, consumer connection, and product innovation as pillars of the Company's growth strategy.

81.    Defendant Friend also reiterated that CDA was transforming Nike's business. Defendant Friend stated that Nike's "continued momentum shows that our strategy is working," and described Nike's direct-to-consumer and digital transformation as creating long-term value. Defendant Friend also discussed Nike's work with Adobe and the Company's use of marketing technology, data, and consumer insight to support Nike's digital ecosystem.

***July 21, 2022 Form 10-K***

82.    On July 21, 2022, Nike filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2022 (the "2022 Form 10-K"). The 2022 Form 10-K was signed by Defendants Donahoe, Friend, Parker, Benko, Cook, Duckett, Graf, Henry, Knight, Peluso, and Rogers.

83.    The 2022 Form 10-K warned that the Company's results could be harmed if it failed to "anticipate and respond" to changes in consumer preferences, develop new products, maintain its brand image, respond to competitors, or successfully operate and upgrade its digital technology platforms.

84.    The Form 10-K also warned that Nike had made "significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations," and that its digital offerings would require "continued investment in the development and upgrading of our technology platforms." The filing further warned that Nike "may not be successful in

developing platforms that operate effectively" with other technologies, systems, networks, or standards.

### *July 21, 2022 Proxy Statement*

85.    Also on July 21, 2022, Nike filed a Proxy Statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited shareholder votes regarding, among other things, director elections, executive compensation, and ratification of the Company's independent auditor.

86.    The Proxy Statement described the Board's risk-oversight responsibilities and represented that Nike maintained governance structures designed to oversee significant business risks. It further emphasized the Company's Code of Conduct and the Board's and committees' roles in overseeing risk management, compliance, internal controls, and disclosure-related matters.

### *September 9, 2022 Annual General Meeting*

87.    On September 9, 2022, Nike held its 2022 Annual General Meeting. During the meeting, Defendant Donahoe assured shareholders that the CDA strategy continued to distinguish Nike from its competitors and position the Company for long-term growth.

88.    Responding to shareholder questions concerning Nike's marketplace strategy and competitive position, Defendant Donahoe emphasized that the Company's strategy had not changed and remained focused on leveraging Nike's direct relationship with consumers. Defendant Donahoe stated that Nike's "marketplace strategy remains the same," explaining that the Company continued to pursue "a balanced marketplace" anchored by Nike Digital, Nike-owned stores, and "a small number of strategic partners."

89.    Defendant Donahoe further represented that Nike continued to benefit from its core competitive advantages, explaining that the Company remained focused on "innovation, our brand,

our direct connection with consumers and our marketplace strategy." According to Defendant Donahoe, these capabilities continued to create meaningful competitive separation and would support Nike's long-term growth objectives.

90.    Defendant Donahoe also represented that Nike's digital ecosystem continued to strengthen consumer relationships, emphasizing that the Company's membership platform, digital capabilities, and direct engagement with consumers allowed Nike to better understand consumer demand and respond with greater speed and precision than its competitors.

***September 29, 2022 Earnings Release and Conference Call***

91.    On September 29, 2022, Nike issued a press release announcing its financial results for the first quarter of fiscal year 2023 (the "Q1 2023 Press Release") and held an accompanying earnings conference call. The Q1 2023 Press Release quoted Defendant Donahoe as stating: "Our strong first quarter results demonstrate the strength of the NIKE brand and our deep connection with consumers. Our Consumer Direct Acceleration strategy continues to create competitive advantage as we navigate a dynamic operating environment."

92.    During the accompanying earnings call, Defendant Donahoe again emphasized that Nike continued to outperform competitors because of the Company's strategic transformation, stating that "we're creating more separation between us and our competition." Defendant Donahoe attributed that competitive position to Nike's "deep consumer connections," "relentless pace of innovation," and "the competitive advantages we've built through Consumer Direct Acceleration."

93.    Defendant Donahoe further emphasized that Nike's direct relationship with consumers remained a defining competitive advantage, explaining that the Company was leveraging "our membership ecosystem," "our digital leadership," and "our marketplace strategy" to navigate

the operating environment while continuing to "serve consumers in a more personal way than ever before."

94.    Defendant Friend similarly portrayed the Company's operational initiatives as succeeding, explaining that Nike remained "confident in the long-term opportunity," stating that the Company would continue investing in "our innovation pipeline," "our digital capabilities," and "our direct consumer relationships," because those investments would continue "to create value over the long term." Defendant Friend further represented that Nike possessed "healthy consumer demand" and that management remained focused on executing the CDA strategy while driving sustainable profitable growth.

*October 6, 2022 Form 10-Q*

95.    On October 6, 2022, Nike filed its Quarterly Report on Form 10-Q for the quarter ended August 31, 2022 (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendants Donahoe and Friend and represented that CDA was transforming Nike into "the marketplace of the future" through premium, seamless consumer experiences led by Nike Digital, Nike-owned stores, and select strategic wholesale partners.

96.    The Q1 2023 10-Q further represented that Nike continued investing in "data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation" designed to accelerate the Company's digital transformation.

97.    The Q1 2023 10-Q also continued to describe Nike's organizational restructuring around men's, women's, kids', and Jordan Brand consumer constructs as an integral component of CDA and represented that those initiatives continued to support the Company's long-term growth strategy.

*December 20, 2022 Earnings Release and Conference Call*

98.    On December 20, 2022, Nike issued a press release announcing its financial results for the second quarter of fiscal year 2023 (the "Q2 2023 Press Release") and held an accompanying earnings conference call. The Q2 2023 Press Release quoted Defendant Donahoe as stating that "our second quarter results demonstrate the strength of our consumer connections and the continued success of our strategy."

99.    Defendant Donahoe further assured investors that Nike remained "on track to deliver on our operational and financial goals—setting the foundation for sustainable, profitable growth."

100.    During the earnings call, Defendant Donahoe continued to emphasize the Company's purported competitive advantages, stating: "Our results speak to how we've leveraged our competitive advantages, which include a relentless innovation pipeline, unmatched brands, and deep consumer connections to build relative strength and stay ahead of competition."

101.    Donahoe further represented that Nike continued to benefit from "the meaningful relationships we have with consumers," explaining that those relationships, together with Nike's innovation and digital capabilities, were "creating more separation between us and our competition." He also reiterated that the Company remained focused on executing its long-term strategy despite short-term challenges, stating that management continued "to invest in innovation, digital leadership, and the marketplace of the future."

102.    Defendant Friend likewise attributed Nike's performance to CDA, stating that the Company continued "to execute against our strategy," while emphasizing Nike's "consumer-led digital transformation," "strong marketplace position," and "long-term financial model." Defendant Friend further represented that Nike's investments in digital capabilities, product innovation,

and direct consumer relationships continued to position the Company for "sustainable, profitable growth" notwithstanding the near-term inventory and macroeconomic headwinds discussed during the quarter.

### January 5, 2023 Form 10-Q

103.    On January 5, 2023, Nike filed its Quarterly Report on Form 10-Q for the quarter ended November 30, 2022 (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendants Donahoe and Friend. Consistent with the Company's prior filings, the Q2 2023 10-Q continued to portray the CDA strategy as successfully transforming Nike's business and represented that Nike had aligned its operations around a new consumer construct while investing in the technological capabilities necessary to support its digital transformation. Specifically, Q2 2023 10-Q stated:

> Additionally, we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids' and continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation.

### March 21, 2023 Earnings Release and Earnings Call

104.    On March 21, 2023, Nike issued a press release announcing its financial results for the third quarter of fiscal 2023 (the "Q3 2023 Press Release"). In the Q3 2023 Press Release, Defendant Donahoe again assured shareholders that the Company's strategy remained successful, stating: "NIKE's strong results in the third quarter offer continued proof of the success of our Consumer Direct Acceleration strategy."

105.    During the accompanying earnings call, Defendants continued emphasizing the same operational themes that had defined Nike's public messaging since the launch of CDA. Responding to questions concerning Nike's future growth opportunities and product pipeline, Defendant Donahoe stated that:

The breadth and depth of the innovation pipeline is really strong and what's clear is as we've returned to the office, as our teams are now back together in-person, that NIKE magic of consumer insight driving product innovation combined with story-telling, combined with marketplace, is really picking up steam.

### May 24, 2023 Leadership Announcement

106.    On May 24, 2023, Nike announced several senior leadership changes intended to "deepen consumer-led growth and marketplace advantage." In the accompanying press release, Defendant Donahoe succinctly summarized the themes that had become central to Nike's public narrative: "Our brand momentum is strong, our innovation pipeline is unmatched, and our strategy is working."

### June 29, 2023 Fourth Quarter and Fiscal Year 2023 Results

107.    On June 29, 2023, Nike issued a press release announcing its fourth quarter and full fiscal year 2023 financial results (the "Q4 2023 Press Release"). The Q4 2023 Press Release quoted Defendant Donahoe as stating:

> NIKE's strong results make clear that our strategy is working. FY23 was a milestone year for NIKE as our unique advantages continue to drive competitive separation. Our investment in innovation and our digital leadership are fueling broad-based growth across our portfolio of brands, as we create value by serving the future of sport.

108.    Later that same day, during a related earnings call, Defendant Donahoe continued portraying CDA as a success, telling investors: "Fiscal '23 was a milestone year for NIKE... It's clear that our strategy is working, and that NIKE's unique advantages continue to drive competitive separation."

109.    Defendant Donahoe further assured investors that: "In the end, our CDA strategy is working. Our brands have strong energy. Our innovation pipeline is as relentless as ever and we're executing against what matters most to consumers."

110.    Defendant Friend likewise emphasized that Nike had continued increasing its competitive advantages through product innovation, consumer engagement, and marketplace management, stating that Nike had "drove competitive separation by doing what NIKE does best" through "product innovation," "rich storytelling," and deeper consumer connections that would "drive sustainable profitable growth."

111.    Defendant Friend also highlighted Nike's technology initiatives, specifically touting the Company's partnership with Adobe as evidence that Nike had successfully developed sophisticated consumer-personalization capabilities. According to Defendant Friend:

> We have partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion.... We are only beginning to operationalize these new capabilities and consumer experiences on our digital platforms, and we see even greater opportunity to come.

### July 20, 2023 Form 10-K and Proxy Statement

112.    On July 20, 2023, Nike filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2023 (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Donahoe, Friend, Parker, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Peluso, Rogers, and Swan.

113.    The 2023 Form 10-K contained substantially similar language as the 2021 Form 10-K and the 2022 Form 10-K, warning that Nike could be adversely affected if it failed to maintain its brand strength, develop innovative products, respond to changing consumer preferences, compete effectively, or successfully develop and integrate its technology platforms.

114.    The 2023 Form 10-K represented that Nike had made "significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations" and emphasized that the Company would continue investing in "the development and upgrading

of our technology platforms" to support its digital business. The 2023 Form 10-K further represented that Nike's future success depended on its ability to "develop[] new products, styles and categories," "anticipate[] and respond[] to changing consumer preferences," and maintain "the strength and reputation of our brand."

115.    At the same time, however, the 2023 Form 10-K characterized as contingent future risks the possibility that Nike "may not be successful in developing platforms that operate effectively with other technologies, systems, networks or standards," or that it might fail to maintain its innovation pipeline, competitive position, and digital capabilities—the same operational areas that Defendants had repeatedly represented were driving the success of the CDA strategy throughout the Relevant Period.

116.    Also on July 20, 2023, Nike filed its annual proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited shareholder votes for the election of directors, approval of executive compensation, and related corporate matters. The 2023 Proxy Statement again represented that the Board actively oversaw the Company's most significant business risks through its committee structure and governance processes. It further emphasized the Board's oversight of enterprise risk management, compliance, financial reporting, internal controls, executive leadership, and strategic initiatives, including matters central to Nike's long-term business strategy.

### September 12, 2023 Annual Meeting of Shareholders

117.    On September 12, 2023, Nike held its Annual Meeting of Shareholders. During the meeting, Defendant Donahoe continued to assure shareholders that Nike remained committed to the CDA strategy and that the Company's long-term competitive advantages remained unchanged. Defendant Donahoe emphasized that management had not altered its strategic direction, stating

that "our strategy has not changed" and reaffirming that Nike remained focused on "innovation," "our brand," and "our direct connection with consumers" as the pillars of the Company's long-term growth. Defendant Donahoe further represented that Nike's marketplace strategy continued to differentiate the Company from its competitors and positioned Nike to "serve the future of sport."

118.    In response to a shareholder question regarding whether Nike had "changed" its strategy in light of "headlines about re-entering various wholesalers," Defendant Donahoe denied that the Company was retreating from its direct-to-consumer strategy, stating:

> Our marketplace strategy remains the same. Simply put, our focus is to serve consumers with what they want, when they want it and how they want it. And NIKE creates distinction across the marketplace by segmenting our consumer experiences to drive deep and direct connections with consumers across all channels.

### September 28, 2023 Earnings Release and Earnings Call

119.    On September 28, 2023, Nike issued a press release announcing its financial results for the first quarter of fiscal 2024 (the "Q1 2024 Press Release"). The Q1 2024 Press Release again assured investors that Nike's long-term strategy remained successful and that management continued executing effectively against the CDA strategy. In the Q1 2024 Press Release, Defendant Donahoe stated: "Our first quarter results demonstrate the continued strength of our brand and our ability to execute our strategy in a dynamic operating environment."

120.    During the accompanying earnings call, Defendant Donahoe emphasized that Nike's product development efforts remained strong, stating: "Now, our teams have been back together in-person over the past 15 months and our innovation pipeline is strong and it was on full display." He continued, stating that "the excitement and alignment of our leadership team was clear as we continued to obsess the product and storytelling we'll be bringing to life for consumers at the Paris Olympics and into the fall."

121.    Defendant Donahoe again highlighted Nike's product innovation, explaining that the Company's innovation pipeline remained "strong" and that management continued to see "tremendous opportunity" to accelerate growth through new products, digital engagement, and consumer-focused execution. He further represented that Nike's long-term strategy remained unchanged and that the Company continued investing behind its most significant competitive advantages, including innovation, brand strength, and digital leadership.

122.    Defendant Friend likewise assured investors that Nike remained well positioned to deliver long-term profitable growth, stating that management was "confident in NIKE's new product innovation pipeline, brand strength, deep consumer connections and the health and shape of our marketplace," and that Nike's "Q1 results reaffirm our expectation for healthy profitable growth this fiscal year." Defendant Friend further emphasized that "NIKE Direct grew 6%," that Nike saw "sustained momentum on the NIKE mobile app with growth in traffic and increasing member buying frequency," and that "more consumers start their shopping journeys with us on mobile." In response to an analyst question regarding long-term margin opportunity, Defendant Friend reiterated that Nike "remain[ed] confident in our ability to drive our long-term financial goals," and represented that Nike would become "a more direct and a more digital company and a more profitable company," with "a channel mix and channel profitability opportunity that comes with that as well."

### December 21, 2023 Earnings Release and Earnings Call

123.    On December 21, 2023, Nike issued a press release announcing its financial results for the second quarter of the 2024 fiscal year, in which Defendants continued to portray the Company's operational strategy and organizational changes as successful while characterizing the challenges as manageable and temporary.

124. During the accompanying earnings call, Defendant Friend acknowledged that Nike's marketplace performance had fallen short of internal expectations, stating: "Total retail sales across the marketplace fell short of our expectations."

125. Defendant Friend attributed those results to "higher levels of promotional activity across the marketplace," which had adversely affected Nike Digital traffic, but assured investors that management was responding. Specifically, Defendant Friend announced that Nike was "adjusting our channel growth plans for the remainder of the year" while simultaneously "identifying opportunities across the company to deliver up to $2 billion in cumulative cost savings over the next three years."

126. Defendant Friend explained that those initiatives would include "simplifying our product assortment," improving "supply chain efficiency," increasing automation, and "streamlining our organization structure." Rather than suggesting that the CDA strategy itself had failed, Defendant Friend presented these initiatives as operational refinements that would strengthen Nike's execution while preserving its long-term strategic objectives.

127. Later during the earnings call, a J.P. Morgan analyst asked management to elaborate on the Company's announced structural changes and organizational realignment. In response, Defendant Donahoe assured investors that Nike's recent reorganization had improved execution rather than reflected broader strategic problems: "[S]ix months ago, we realigned our entire organization under Heidi O'Neill and Craig Williams as our Co-Presidents, and it is making a huge difference in our focus and ability to execute."

### *March 21, 2024 Earnings Release and Earnings Call*

128. On March 21, 2024, Nike announced its financial results for the third quarter of the 2024 fiscal year. During the accompanying earnings call, Defendant Donahoe acknowledged that

the Company had failed to achieve its expected performance, stating: "NIKE is not performing at our potential."

129.   Defendant Donahoe nevertheless characterized the Company's response as an evolution—not an abandonment—of the CDA strategy. He explained: "While NIKE Direct will continue to play a critical role, we must lean in with our wholesale partners to elevate our brand and grow the total marketplace."

130.   Defendant Donahoe further represented that management intended to combine "the best of our direct offense" with "a reinvestment with our wholesale partners, so we bring a more holistic offense that grows the market and gets in the path of our consumer."

131.   Despite acknowledging that Nike needed to make strategic adjustments, Defendant Donahoe continued to defend the underlying CDA strategy, representing that "our Consumer Direct Acceleration strategy has driven growth and direct connections with consumers."

**The Truth is Revealed**

*June 27, 2024 Earnings Release and Earnings Call*

132.   On June 27, 2024, Nike issued a press release announcing its financial results for the fourth quarter and full 2024 fiscal year. The Company reported declining fourth-quarter revenue, declining Nike Direct and Nike Digital sales, and issued significantly weaker guidance for the 2025 fiscal year.

133.   During the accompanying earnings call, Defendant Donahoe acknowledged that the Company faced significant challenges, stating: "Fiscal '25 will be a transition year for our business."

134.   Defendant Donahoe nevertheless sought to reassure investors that management remained in control of Nike's long-term strategy, explaining that the Company had "highlighted the

41

strategic shifts we're taking as a company, including leadership and organization changes," and was "making a series of adjustments to position us to compete and win."

135. Defendant Friend similarly disclosed that Nike expected 2025 revenue "to be down mid-single digits with the first half down high single digits" because of a "more pronounced impact" from adverse factors affecting the business. Defendant Friend further acknowledged that Nike had experienced a "more pronounced" decline in its lifestyle products on Nike Digital than previously anticipated and explained that, in order to "manage the health of [Nike's largest franchises]," the Company would be "reducing what we're offering to consumers through our digital channel."

136. Defendant Friend further explained that the Company's outlook reflected "timelines and pacing to manage marketplace supply of our classic footwear franchises" and "lower NIKE Digital growth . . . as we scale product innovation and newness across the marketplace."

137. Defendant Donahoe also revealed that Nike was reversing key components of the CDA strategy, stating that Nike was now "completely aligned across the organization around sport" categories, which the Company referred to as "field[s] to play." Defendant Donahoe further acknowledged that Nike had "spent a lot of time leaning in with our wholesale partners," while Defendant Friend represented that Nike was "repositioning NIKE to be more competitive, with a more balanced portfolio to drive sustainable, profitable, long-term growth."

138. These disclosures represented a marked departure from Defendants' repeated assurances throughout the Relevant Period that Nike's digital transformation, direct-to-consumer strategy, innovation pipeline, and marketplace initiatives were successfully positioning the Company for sustained long-term growth. Although Defendants continued characterizing the Company's actions as strategic adjustments, they simultaneously disclosed declining digital performance,

materially reduced financial guidance, and significant changes to the Company's digital merchandising strategy.

139.    Despite these admissions, Defendants Donahoe and Friend continued assuring investors that Nike's long-term strategy remained on track. Defendant Donahoe stated that he was "confident that our teams are lining up our competitive advantages to create greater impact for our business." Defendant Friend similarly represented that Nike's "scaling of newness is on track" and that, "as we accelerate our pace of newness and innovation, the early response from consumers and partners are reinforcing our optimism in NIKE's path forward."

***July 25, 2024 Form 10-K***

140.    On July 25, 2024, Nike filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2024 (the "2024 Form 10-K"). The 2024 Form 10-K was signed by Defendants Donahoe, Friend, Parker, Benko, Cook, Duckett, Gil, Graf, Henry, Knight, Peluso, Rogers, and Swan.

141.    The 2024 Form 10-K continued presenting many of the operational problems confronting Nike as hypothetical future risks rather than conditions already affecting the business. For example, Defendants warned that Nike's inability to "adjust[] the mix of existing product offerings" or "develop[] new products, styles and categories" to satisfy consumer demand "could have a material adverse effect on our sales and profitability."

142.    The 2024 Form 10-K likewise warned: "If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products."

143. The 2024 Form 10-K further stated that: "Failure to maintain our reputation, brand image and culture could negatively impact our business."

144. Finally, the Form 10-K emphasized Nike's investments in digital technologies while cautioning: "We have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations... We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards."

145. These risk disclosures closely tracked similar statements contained in prior Forms 10-K and 10-Q. Even after Nike had publicly acknowledged slowing digital performance, renewed emphasis on wholesale partners, declining revenues, and substantial organizational changes, Defendants continued describing deterioration in Nike's product pipeline, competitive position, brand strength, and digital capabilities principally as contingent future risks rather than conditions that had already materially affected the Company's business and the viability of the CDA strategy.

146. The July 2024 Form 10-K also continued representing that the Board maintained appropriate oversight of the Company's operations, strategic initiatives, and risk management processes while omitting that, throughout the Relevant Period, Defendants had repeatedly assured shareholders that Nike's innovation pipeline, digital transformation, consumer-direct strategy, and marketplace initiatives were succeeding despite mounting internal operational deficiencies and the Company's increasing reliance on wholesale partners to stabilize its business.

### *September 19, 2024 CEO Transition Announcement*

147. On September 19, 2024, Nike announced in a press release that Defendant Donahoe would step down as President and CEO and that longtime Nike executive Elliott Hill would return as President and CEO effective October 13, 2024. The press release emphasized that Hill would focus on "delivering bold, innovative products" and "reconnect[ing]" with Nike's "trusted

partners," reflecting a renewed emphasis on innovation and wholesale relationships following years of promoting the CDA strategy.

148. On October 1, 2024, Nike announced its financial results for the first quarter of the 2025 fiscal year and held an accompanying earnings conference call. During that call, Defendant Friend disclosed that Nike was "withdrawing our full year guidance," while stating that the Company expected "Q2 revenues to be down in the 8% to 10% range" and "Q2 gross margins to be down approximately 150 basis points." Defendant Friend attributed those expectations, in part, to "higher promotions," "channel mix headwinds," and the Company's continuing efforts to manage its product franchises.

149. During the same October 1, 2024 earnings call, Defendant Friend acknowledged continuing weakness in Nike's digital business and the Company's renewed emphasis on wholesale relationships. Specifically, Defendant Friend stated that Nike had experienced "particular softness in traffic on NIKE Digital" and that the Company had "been closely engaging with our partners since we acknowledged some of the missteps related to over-centering on Direct." Those statements represented a marked departure from Defendants' repeated representations throughout the Relevant Period that Nike's direct-to-consumer strategy, digital ecosystem, and marketplace initiatives had strengthened Nike's competitive position and deepened its consumer relationships.

150. Defendant Friend further acknowledged that Nike had suffered competitive harm from its prior strategic decisions. He stated that "the multi-brand environment is very competitive today, and it will take time to expand market share." Defendant Friend further admitted that Nike had "acknowledged that we've lost market share in the running specialty channel," explaining that "[m]ore than four years ago, we pulled back on our engagement with that channel. And as a result of that, we saw market share losses." Those admissions directly contradicted Defendants' repeated

statements throughout the Relevant Period that the CDA strategy had strengthened Nike's marketplace position and enhanced its relationships with consumers.

151.    As alleged herein, these successive disclosures and admissions confirmed what Defendants had repeatedly denied throughout the Relevant Period: that Nike's CDA strategy had not strengthened the Company's innovation pipeline, digital leadership, marketplace strategy, or competitive position. Instead, Nike ultimately acknowledged that it needed to restore its sport-based organizational focus, rebuild relationships with wholesale partners, revitalize product innovation, improve supply-chain execution, and reverse its prior overemphasis on Nike Digital. These admissions demonstrate that Defendants repeatedly represented that the Company's core strategic initiatives were succeeding while failing to disclose material facts concerning the deterioration of Nike's innovation pipeline, marketplace position, wholesale relationships, and competitive standing.

152.    The foregoing statements were false and misleading because they omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, throughout the Relevant Period, the Individual Defendants failed to disclose that: (1) Nike's CDA strategy had caused the Company to lose critical wholesale relationships, impaired demand forecasting and inventory management, reduced innovation and product creation, and eroded Nike's competitive position in the marketplace; (2) Nike's digital transformation was plagued by operational deficiencies that hindered the Company's ability to execute its direct-to-consumer strategy; (3) the Company lacked adequate internal controls necessary to successfully implement the CDA strategy; (4) Nike was experiencing significant competitive pressures and declining consumer demand that materially undermined its growth strategy, market position, and financial outlook; (5) contrary to Defendants' repeated assurances that the Company was well positioned for long-term growth, Nike was being forced to abandon significant aspects

of the CDA strategy and undertake an operational turnaround; and (6) as a result of the foregoing, Defendants' positive statements concerning Nike's business, operations, strategy, competitive position, financial condition, and future prospects lacked a reasonable basis and were materially false and misleading when made.

***The Securities Class Action Amended Complaint and Confidential Witness Allegations***

153.    On March 24, 2025, the lead plaintiffs in the Securities Class Action filed a Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "SAC") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Nike and certain of its senior executives.

154.    The SAC relies upon the accounts of sixteen confidential witnesses ("CWs"), many of whom worked directly on the CDA strategy or within the business units responsible for implementing it. These witnesses included, among others, former vice presidents responsible for Nike Digital products and digital design, directors overseeing direct-to-consumer merchandising and wholesale relationships, finance managers responsible for strategic digital investments, supply chain finance personnel, technology leaders, product directors, store development executives, and employees involved in implementing Nike's digital commerce platforms and marketplace initiatives. Collectively, these witnesses occupied positions that provided firsthand knowledge of the Company's internal operations and the execution of the CDA strategy.

155.    According to the SAC, the confidential witnesses consistently described a substantial disconnect between Defendants' public statements and the Company's internal operations. Their accounts support allegations that Nike struggled to implement the technological infrastructure necessary to support its direct-to-consumer strategy; experienced persistent deficiencies in its digital platforms and supply chain; failed to develop the organizational capabilities necessary to

execute the CDA strategy effectively; disrupted its product development process through repeated reorganizations; over-relied on legacy footwear franchises at the expense of meaningful innovation; weakened relationships with key wholesale partners; and gradually lost competitive positioning as consumers increasingly gravitated toward competitors offering more innovative products.

156.     The confidential witnesses also describe how these problems were repeatedly communicated to senior management through regular reporting channels, strategic planning meetings, financial reporting, technology reviews, merchandising discussions, and operational updates. Several witnesses specifically allege that information concerning the performance of Nike's digital initiatives, strategic investments, financial results, and operational challenges was regularly escalated through senior leadership and, in certain instances, directly to Defendant Donahoe before quarterly earnings calls and investor presentations.

157.     Relying on these accounts, the SAC alleges that Defendants repeatedly assured investors throughout the Relevant Period that the CDA strategy was succeeding while simultaneously representing that Nike had successfully developed the technological capabilities, supply chain infrastructure, organizational structure, innovation pipeline, marketplace strategy, and competitive advantages necessary to support that strategy. The confidential witness allegations, however, describe an internal reality in which those initiatives were experiencing significant operational failures long before the Company publicly acknowledged them.

### THE INDIVIDUAL DEFENDANTS CAUSED NIKE TO REPURCHASE ITS OWN COMMON STOCK AT INFLATED PRICES

158.     During the Relevant Period, the Individual Defendants caused the Company to repurchase its own Class B common stock at inflated prices, which substantially damaged the Company. As set forth in the Company's quarterly reports filed on Form 10-Q with the SEC, from

April 2021 through February 2024, the Company repurchased 106,889,217 shares of its own Class B common stock for approximately $8.75 billion. As the Company's stock was worth approximately $75.37 per share, the price at closing on June 28, 2024, the Company overpaid by approximately $3.5 billion for repurchases of its own stock during the Relevant Period.

## INSIDER TRADING BY THE INDIVIDUAL DEFENDANTS DURING THE RELEVANT PERIOD

159.    During the Relevant Period and while in possession of material non-public Company information, Defendants Donahoe, Friend, and Parker (the "Insider Selling Defendants") sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein. These sales enabled the Insider Selling Defendants to avoid the staggering losses the Company's other stockholders suffered.

160.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Donahoe sold 105,540 shares of Nike stock, receiving gross proceeds of $13,493,712.[1]

161.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Friend sold 105,280 shares of Nike stock on the open market, receiving gross proceeds of $14,378,604. In addition to these open market sales, Defendant Friend also disposed of 47,392 shares of his Nike stock through Code F transactions, worth $5,437,895. In total, Defendant Friend sold 152,672 shares of Nike stock for collective gross proceeds of approximately $19,816,499.

---

[1] These transactions were coded with an "F" designation on Defendants' SEC Form 4s. Such "Code F" transactions are defined by the SEC as the "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."

162.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Parker sold 1,661,428 shares of Nike stock on the open market, receiving gross proceeds of $208,679,987. In addition to these sales, Defendant Parker also disposed of 25,583 shares of his Nike stock through Code F transactions, worth $3,893,946. In total, Defendant Parker sold 1,687,011 shares for collective gross proceeds of approximately $212,573,933.

163.     As a result of the false and misleading statements and the failures to disclose, the Insider Selling Defendants sold stock at artificially inflated share prices not reflective of the Company's value, which the Insider Selling Defendants knew at the time they made those sales.

### DAMAGES TO NIKE

164.     As a direct and proximate result of the Individual Defendants' misconduct, Nike has expended and will continue to expend significant sums of money.

165.     Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

166.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

167.     As a direct and proximate result of the Individual Defendants' conduct, Nike has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

168.    Plaintiff brings this action derivatively in the right of and for the benefit of Nike to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

169.    Nike is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

170.    Plaintiff is an owner of Nike stock and has been a continuous shareholder of Company stock at all relevant times.

171.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

172.    The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

173.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

174.    On June 1, 2026, Plaintiff, through Plaintiff's counsel, served the Demand on Nike's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by issuing and allowing Nike to issue improper statements. *See* Exhibit A.

51

175.    On June 18, 2026, Plaintiff's counsel received the Refusal Letter, which stated that the Board intended "to defer substantive consideration" of the Demand and that it would revisit the Demand "when appropriate, including potentially following final resolution of the Securities Class Action." *See* Exhibit B.

176.    Attached to the Refusal Letter is a Resolution of the Board of Directors of Nike, Inc. dated March 13, 2025 (the "Resolution"). The Resolution explains that the Board elected to postpone action in response to the Demand due to the ongoing nature of the Securities Class Action, the possibility that future discovery could provide additional information, the potential impact on the Company's litigation posture in the Securities Class Action, the costs of an investigation, and the distraction to management. The Resolution also provides that the Director Defendants (defined below) will not assert statute-of-limitations defenses with respect to claims that were not already time-barred when the Demand was served and that are later asserted in litigation related to the Demand. *See id*.

177.    At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Parker, Cook, Duckett, Gil, Henry, Knight, Peluso, Rogers, Swan (the "Director Defendants"), as well as Non-Parties Elliott Hill, Philip H. Knight, Jorgen Vig Knudstorp, and Maria Henry.

178.    Oregon law contemplates that a shareholder derivative complaint may proceed where a litigation demand has been "refused or ignored" ORS § 60.261(2). Oregon courts have looked to Delaware law in applying Oregon's demand requirement. *See Crandon Capital Partners v. Shelk*, 219 Or. App. 16, 31–35 (2008); *Sommers ex rel. FLIR Sys., Inc. v. Lewis*, 641 F. Supp. 2d 1151, 1155-56 (D. Or. 2009). Accordingly, Delaware's constructive refusal jurisprudence provides the governing framework for determining whether the Board's response constituted a refusal of the

Demand.

179.    Although the Board has not expressly rejected the Demand, it elected not to exercise its business judgment. Because the Board intentionally suspended both investigation and substantive consideration of the Demand for an indefinite period, it has constructively refused the Demand. *See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 976-77 (Del. Ch. 2013) (prolonged inaction on a litigation demand may constitute constructive refusal where the complaint raises a reasonable doubt that the board's inaction was a valid exercise of business judgment).

180.    The Resolution confirms that the Board impermissibly deferred both "substantive consideration and investigation" of the Demand. Upon receipt of a shareholder demand, a board is expected to investigate the alleged wrongdoing and determine whether the corporation should pursue the requested claims. *See Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990); *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) ("[T]he board is expected to 'consider and decide whether or not to take action in response to the demand.'"). Rather than determining whether the misconduct alleged in the Demand occurred, whether the Company possesses viable causes of action, or whether pursuing those claims would be in the Company's best interests, the Board chose to postpone any such determination indefinitely.

181.    The Resolution contains no substantive evaluation of the Demand itself. The Board made no findings concerning the alleged misconduct, expressed no view regarding the merits of Plaintiff's allegations, and did not conclude that litigation would be contrary to the Company's interests. Instead, the Board merely announced that it would defer consideration. The absence of any investigative record is particularly significant because, in evaluating whether a board's response (or lack thereof) to a demand is protected by the business judgment rule, Delaware courts examine whether the board undertook an informed process in good faith. *See Rich*, 66 A.3d at 976-

77.

182.    The Board's decision to postpone consideration of the Demand constitutes a constructive refusal. Unlike cases in which courts have deferred to boards that were actively investigating shareholder demands, the Refusal Letter and Resolution reflect that no investigation was undertaken. *See id*. By conditioning any investigation or exercise of business judgment on the completion of complex federal securities litigation, the Board elected not to act within a reasonable period of time. A board cannot indefinitely suspend its obligation to evaluate a shareholder demand merely because related litigation remains pending. Courts recognize that overlapping litigation may justify delaying an investigation for a limited period of time, but those cases contemplate a board that is actively exercising its business judgment—not one that affirmatively resolves to defer both investigation and substantive consideration until an uncertain future date. *See Templin v. Baier*, No. 3:21-cv-00373, 2024 WL 38296 (M.D. Tenn. Jan. 3, 2024); *Lowinger v. Oberhelman*, 924 F.3d 360, 368 (7th Cir. 2019).[2]

183.    Through the Resolution, the Board attempted to mitigate one procedural consequence of its indefinite deferral by stating that it would not assert a statute-of-limitations defense as to claims that were not already time-barred when the Demand was served. That waiver, however, does not alter the fact that the Board expressly declined to undertake any present investigation or substantive evaluation of the Demand. Nor does it excuse the Board's decision to postpone the

---

[2] Courts have distinguished between temporary investigative delays during the pendency of related litigation and a board's failure to exercise its fiduciary responsibilities. In *Templin*, the court recognized that the existence of overlapping litigation may justify delaying further action on a shareholder demand where the board remains engaged in evaluating the demand. *Templin*, 2024 WL 38296 (quoting *Lowinger ex rel. Caterpillar, Inc. v. Oberhelman*, No. 1:15-cv-01109-SLD-JEH, 2017 WL 1224524, at *3 (C.D. Ill. Mar. 31, 2017)). Here, by contrast, the Board expressly resolved to defer the investigation itself until "potentially following final resolution" of separate litigation that had only recently entered discovery.

exercise of its business judgment until the uncertain future resolution of separate litigation. The Resolution is not a negotiated tolling agreement with Plaintiff. It does not suspend a defined limitations period, identify Plaintiff as a party, define the scope of "litigation related to the Demands," specify its duration, identify the persons or entities entitled to enforce it, or establish any mechanism for resolving disputes concerning its interpretation or application. Thus, rather than providing the certainty ordinarily associated with a formal tolling agreement, the Resolution merely invites Plaintiff to rely upon an informal and incomplete promise, the scope, enforcement, and application of which remain undefined.

184.    The Resolution therefore reflects an effort to postpone judicial scrutiny without requiring the Board to undertake its investigative responsibilities. Courts routinely recognize that the business judgment rule does not protect directors who consciously failed to act upon a shareholder demand. *See Rich*, 66 A.3d at 976-77.[3] Rather than investigating the allegations presented in the Demand and determining whether the Company should pursue those claims, the Board adopted a half measure designed to forestall immediate litigation while reserving for itself the ability to postpone any substantive consideration until the eventual conclusion of separate litigation. Such an indefinite deferral, coupled with an incomplete limitations waiver, does not constitute a good-faith exercise of business judgment regarding the Demand, but instead confirms that the

---

[3] This case should be distinguished from *Green v. Paz,* 2021 WL 11661345 (D. Del. Dec. 10, 2021), and *Lowinger*, where the boards represented that the shareholder demands remained under consideration during the pendency of related litigation. In *Green*, the board advised the shareholder that it remained in the process of considering a complex demand. In Lowinger, the board advised the shareholder that the demand remained under consideration and that it would determine whether further action was warranted as circumstances developed. Here, by contrast, the Board did not represent that it was conducting an investigation or actively considering whether Nike should pursue the claims asserted in Plaintiff's Demand. Instead, it deferred consideration until the occurrence of an uncertain future event.

Board elected to delay reckoning with the Demand rather than discharge its fiduciary obligations in response to it.

185.    The Board therefore did not exercise its business judgment independently, reasonably, or in good faith upon all reasonably available information. Because the Board has neither conducted nor undertaken any present evaluation of the Demand within a reasonable time, its indefinite deferral constitutes a constructive refusal, and Plaintiff is entitled to proceed derivatively on behalf of Nike.

## COUNT ONE

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    The Director Defendants solicited the 2022 and 2023 Proxy Statements containing materially false and misleading statements and/or omissions.

188.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

189.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

190. The 2022 and 2023 Proxy Statements failed to disclose, among other things, that: (1) Nike's CDA strategy had caused the Company to lose critical wholesale relationships, impaired demand forecasting and inventory management, reduced innovation and product creation, and eroded Nike's competitive position in the marketplace; (2) Nike's digital transformation was plagued by operational deficiencies that hindered the Company's ability to execute its direct-to-consumer strategy; (3) the Company lacked adequate internal controls necessary to successfully implement the CDA strategy; (4) Nike was experiencing significant competitive pressures and declining consumer demand that materially undermined its growth strategy, market position, and financial outlook; and (5) contrary to Defendants' repeated assurances that the Company was well positioned for long-term growth, Nike was being forced to abandon significant aspects of the CDA strategy and undertake an operational turnaround. As a result, Nike's public statements were materially false and misleading at all relevant times.

191. In addition, the 2022 and 2023 Proxy Statements failed to disclose that contrary to their statements regarding the Board's risk oversight functions, the Individual Defendants breached the Code of Conduct by causing the Company to issue false and misleading statements

192. In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 and 2023 Proxy Statements were materially false and misleading.

193. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

194.    Plaintiff on behalf of Nike has no adequate remedy at law.

## COUNT TWO

**Against the Individual Defendants for Violations of Section 10(b) and Rule
10b-5 of the Securities Exchange Act of 1934**

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Nike. Not only is Nike now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in the Securities Class Action, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Nike by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Nike.

197.    During the Relevant Period, the Individual Defendants caused the company to overpay by approximately $3.5 billion to repurchase roughly 106,889,217 shares of its Class B common stock.

198.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

199.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices

and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Nike not misleading.

200.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Nike.

201.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

202.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

203.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

204.    Plaintiff on behalf of Nike has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Breach of Fiduciary Duties

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nike's business and affairs.

207.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

208.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nike.

209.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

210.    In further breach of their fiduciary duties owed to Nike, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Nike's CDA strategy had caused the Company to lose critical wholesale relationships, impaired demand forecasting and inventory management, reduced innovation and product creation, and eroded Nike's competitive position in the marketplace; (2) Nike's digital transformation was plagued by operational deficiencies that hindered the Company's ability to execute its direct-to-consumer strategy; (3) the Company lacked adequate internal controls necessary to successfully implement the CDA strategy; (4) Nike was

experiencing significant competitive pressures and declining consumer demand that materially undermined its growth strategy, market position, and financial outlook; and (5) contrary to Defendants' repeated assurances that the Company was well positioned for long-term growth, Nike was being forced to abandon significant aspects of the CDA strategy and undertake an operational turnaround.

211.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

212.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

213.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

214. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

215. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nike has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

216. Plaintiff on behalf of Nike has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Unjust Enrichment

217. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nike.

219. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Nike that was tied to the performance or artificially-inflated valuation of Nike or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

220. Plaintiff, as a shareholder and a representative of Nike, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from

insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

221.    Plaintiff on behalf of Nike has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Waste of Corporate Assets

222.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

223.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

224.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

225.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

226.    Plaintiff, on behalf Nike, has no adequate remedy at law.

## COUNT SIX

### Against the Individual Defendants for Gross Mismanagement

227.    Plaintiff incorporates by reference and re-alleges each allegation contained above,

63

as though fully set forth herein.

228.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

229.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

230.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### COUNT SEVEN

**Against the Insider Selling Defendants for Insider Selling and Misappropriation of Information**

231.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.    At the time of their stock sales set forth herein, the Insider Selling Defendants knew of the information described above and sold Nike common stock on the basis of such information.

233.    The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Nike common stock.

234.    The Insider Selling Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary

duties of loyalty and good faith.

235.    Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and that Plaintiff has satisfied Oregon's demand requirement;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding punitive damages;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 16, 2026                                    **RANSOM & GILBERTSON, LLP**

                                                        /s/  *Michael K. Yeabsley*
                                                        Michael K. Yeabsley
                                                        5441 S. Macadam Avenue, Suite 301
                                                        Portland, OR 97239
                                                        Telephone: +1.503.226.3664

                                                        *Liaison Counsel for Plaintiff*

                                                        **THE ROSEN LAW FIRM, P.A.**

                                                        Phillip Kim
                                                        275 Madison Avenue, 40th Floor
                                                        New York, NY 10016
                                                        Telephone: (212) 686-1060
                                                        Fax: (212) 202-3827
                                                        Email: philkim@rosenlegal.com

                                                        *Counsel for Plaintiff*